**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**COLUMBIA DIVISION**

**CHRISTOPHER NICHOLSON,**

**Plaintiff,**

**v.**                                                                                          **Case No.**

**HICKMAN COUNTY, TENNESSEE,**
**SOUTHERN HEALTH PARTNERS, INC.;**
**SHERIFF JASON CRAFT, in his official capacity;**
**DETECTIVE DAVID MARTINEZ, in his individual**
**capacity;**
**LT. KEARSTIN ISBELL, in her individual capacity;**
**JANE DOE 1, SHP Nurse, in her individual capacity;**
**and**
**JOHN/JANE DOES 2–5, Hickman County Jail officers**
**or employees, in their individual capacities**

                                                                     **JURY DEMAND**

**Defendants.**
_____/

## **COMPLAINT**

Plaintiff Christopher Nicholson brings this civil rights action under 42 U.S.C. § 1983 and

Title II of the Americans with Disabilities Act arising from the denial of constitutionally

adequate medical care during his pretrial detention at the Hickman County Jail from July 25,

2025 through August 19, 2025. Jail records show Mr. Nicholson was confined on July 25, 2025

at 22:50 and released on August 19, 2025 at 19:20 by court order on medical furlough. During

that period, Defendants knew that Mr. Nicholson had diabetes, required a physician-prescribed

diabetic diet, took multiple prescription medications, and had a physical disability documented at

intake as "HAS ONE LEG." The intake medical questionnaire documented diabetes, a special

diabetic diet, active prescriptions, doctor care, blood pressure issues, TennCare/Blue Care

1

coverage, and a physical handicap noted as "HAS ONE LEG." Despite those known serious medical needs, Defendants failed to provide adequate monitoring, chronic care, wound care, medication documentation, continuity planning, and timely outside medical intervention. The August 19, 2025 medical furlough order stated that Mr. Nicholson was "having severe medical complications with his foot that could require amputation."

**PARTIES**

1. Plaintiff, Christopher Nicholson, is a citizen and resident of Centerville, Tennessee, a person with disabilities, and a former pretrial detainee at the Hickman County Jail. At the time of the events giving rise to this action, Plaintiff was a pretrial detainee at the Hickman County Jail. The booking report lists his confinement reason as "Felony Detainee (Pretrial)."

2. Plaintiff is a qualified individual with a disability under the Americans with Disabilities Act, 42 U.S.C. § 12131(2).

3. Defendant, Hickman County, Tennessee, is a political subdivision organized and existing under the laws of the State of Tennessee. The person authorized to accept service of process on behalf of Hickman County is Mayor Jim Bates, 114 N. Central Avenue #204, Centerville, TN 37033.

4. At all material times, Defendant Hickman County was a political subdivision acting under color of state law within the meaning of 42 U.S.C. § 1983. Hickman County operates, funds, supervises, and maintains the Hickman County Jail through the Hickman County Sheriff's Office.

5. At all material times, Defendant Hickman County has been a public entity as defined by Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131(1).

6. Defendant Southern Health Partners, Inc. ("SHP") is a private medical contractor

that provided medical services to inmates at the Hickman County Jail pursuant to a Health Services Agreement with Hickman County. The Hickman County records include SHP's Health Services Agreement and amendments governing inmate healthcare services at the jail.

7. Defendant Sheriff Jason Craft is the Sheriff of Hickman County. He is sued in his official capacity for injunctive and declaratory relief and as a final policymaker for purposes of Plaintiff's municipal-liability claims. TCI inspection records identify Sheriff Jason Craft as the facility administrator, and the August 12, 2025 TCI inspection letter was addressed to Sheriff Craft.

8. Defendant Lt. Kearstin B. Isbell was the Jail Administrator at Hickman County Jail during the relevant period. She is sued in her individual capacity. The August 12, 2025 TCI inspection report identifies "Isbell, Kearstin B" as Jail Administrator, and the inspection letter was copied to "Kearstin Isbell, Jail Administrator."

9. Defendant Detective David Martinez was a Hickman County Sheriff's Office officer. He is sued in his individual capacity. Jail and affidavit records identify David Martinez as the arresting officer for Mr. Nicholson on July 25, 2025.

10. Defendant Jane Doe 1 is an SHP nurse whose identity is presently unknown. She is sued in her individual capacity. She acted under color of state law within the meaning of 42 U.S.C. § 1983. Mr. Nicholson's August 19, 2025 resident request states that he attempted to notify "the nurse" of the condition of his foot and was told she "didn't have time to fuck with" him. Plaintiff will amend this Complaint to substitute her true name when identified through discovery.

11. Defendants John/Jane Does 2–5 are Hickman County Jail officers, employees, supervisors, or other jail personnel whose identities are presently unknown and who participated in, authorized, ratified, or failed to correct the conduct alleged herein, who acted under color of state law within the meaning of 42 U.S.C. § 1983. They are sued in their individual capacities and

3

will be identified through discovery.

## JURISDICTION AND VENUE

12.    This is an action for violation of Plaintiff's constitutional rights under the Eighth and Fourteenth Amendments brought pursuant to 42 U.S.C. § 1983, and for violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.*

13.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) and (4) (civil rights jurisdiction).

14.    Venue is proper in the Middle District of Tennessee under 28 U.S.C. § 1391(b) because Defendant Hickman County exists in this district and all events giving rise to Plaintiff's claims occurred in Hickman County, Tennessee, which is located within this judicial district.

## FACTS

15.    Mr. Nicholson is a 57-year-old man who has Type 2 diabetes requiring three insulin injections per day to manage his blood sugar levels.

16.    Due to complications relating to his diabetes, Mr. Nicholson had to have his left leg amputated below the knee and as a result uses a prosthetic leg.

17.    Mr. Nicholson's diabetes makes him medically vulnerable to infection, particularly in his extremities. Even minor wounds in diabetic patients can rapidly progress to deep tissue infection, osteomyelitis, and limb loss in the absence of prompt medical attention.

18.    On July 25, 2025, at approximately 8:47 P.M., Officer David Martinez of the Hickman County Sheriff's Office arrested Mr. Nicholson on Highway 100 West near Donna Drive.

19.    During the stop, Mr. Nicholson was forced to sit on a folding chair and had his prosthetic removed because Officer David Martinez claimed he was hiding drugs. No drugs were ever found in his prosthetic. In disassembling and reassembling the prosthetic, Detective Martinez

4

handled it improperly.

20. Mr. Nicholson was booked into Hickman County Jail at approximately 10:50 P.M. on July 25, 2025, as a felony pretrial detainee. Booking Officer Corporal Keisha Walker and Search Officer Rodney Himes processed Mr. Nicholson's intake.

21. Nathan Davis, a Hickman County Jail staff member, completed a medical questionnaire during booking. This questionnaire recorded that Mr. Nicholson had a history of diabetes; had a physical handicap; was on a special diabetic diet prescribed by a physician; was presently taking medications (Lisinopril, Pravastatin, Gabapentin, Adderall, and Levothyroxine); was under a doctor's care; and had blood pressure condition. Specifically, Mr. Davis wrote that Mr. Nicholson "HAS ONE LEG."

22. During the intake process, Mr. Nicholson informed jail staff that he required three insulin shots per day.

23. From the first night of Mr. Nicholson's incarceration, Hickman County Jail had documented knowledge of his disability, diabetic condition, and ongoing prescription medication needs.

24. Per Policy Number 13.001, the sheriff's office is required to make "reasonable efforts" to acquire professional assistance for detainees with special disabilities.

25. Mr. Nicholson's prosthetic leg was confiscated from him on intake and he was given a county issued wheelchair.

26. Hickman County Sheriff's Office stated that the wheelchair remained county-issued equipment. By providing Mr. Nicholson with "county-issued equipment," the Sheriff's Office recognized his need for a mobility accommodation device.

27. Mr. Nicholson was placed in an isolation ward due to his diabetes.

5

28. On or about July 28, 2025, approximately three days after his arrival, Officer Stacy or other jail staff confiscated Mr. Nicholson's wheelchair. Mr. Nicholson was told that it was being taken away from him because he was "playing" with it and was subsequently given his prosthetic leg back.

29. The confiscation of Mr. Nicholson's wheelchair without justification or equivalent accommodation, while retaining his prosthetic for three days, disrupted his mobility and his ability to independently access the medical unit.

30. Contemporaneous with Mr. Nicholson's incarceration, Hickman County Jail was found to have state inspection deficiencies. On August 12, 2025, during the Tennessee Corrections Institute inspection, Hickman County Jail was found to be non-compliant with 14 identified deficiencies. These deficiencies included: medication receipt not meeting standard; medical inventory not meeting standard; inmate criminal history checks not meeting standard; inmate observation parameters not meeting standard; housing units in need of thorough cleaning; training records not meeting standard; documentation for restraints not meeting standard; and the facility operating over capacity (169 inmates in a facility certified for 110), meaning proper classification could not be met.

31. There was systematic inadequate care and deliberate indifference.

### *Inadequate Diabetes Care*

32. While incarcerated at Hickman County Jail, Mr. Nicholson received grossly inadequate care for his diabetes, including insufficient insulin.

33. Instead of receiving the medically required three insulin shots per day, Mr. Nicholson received an average of only two shots every other day, a reduction of approximately 67% from his prescribed regimen.

6

34. Jail medical staff did not order the correct amount or type of insulin for Mr. Nicholson's condition.

35. Jail medical staff failed to monitor Mr. Nicholson's blood glucose levels on a daily basis.

36. As a result of the inadequate insulin and lack of monitoring, Mr. Nicholson's diabetic condition deteriorated rapidly.

37. Mr. Nicholson complained to jail staff that his kidneys were about to shut down due to his uncontrolled diabetes.

38. During his incarceration, Mr. Nicholson developed a serious foot infection after his toenail was caught on a towel and was ripped off his toe.

39. After injuring his toenail, Mr. Nicholson requested to see the medical staff to evaluate his injury, knowing his diabetes could make the injury worse.

40. Per Policy Number 13.002, sick call is "An organized method of treating inmate health problems through a regularly scheduled open house. Sick call provides inmates with the opportunity to report a medical illness or other health problem and to receive diagnosis or treatment to alleviate the condition if reasonably possible."

41. Hickman County Sheriff's Office has the policy of providing inmates with "regular access to health care services … for ongoing or emerging health care problems."

42. Mr. Nicholson was eventually allowed to see a nurse in the medical unit, who subsequently told him that she was refusing to see him, stating, "I don't have time to fuck with you."

43. Mr. Nicholson was brought back to his unit without being evaluated.

44. The nurse knew of his deteriorating condition and refused to treat Mr. Nicholson or

7

keep him for observation.

45. This action violated Policy Number 14.003, which states that "[a]ny inmate that indicates a medical reason that needs to be evaluated by medical personnel will be place [sic] on medical observation."

46. Mr. Nicholson was denied medical care for three weeks. Mr. Nicholson did not have regular access to medical care, despite the mandate of Policy Number 13.002.

47. During this time, Mr. Nicholson was given some gauze and antibiotic ointment that expired the previous year and was told to take care of his foot himself.

48. Mr. Nicholson's foot grew more infected to the point where it developed a pungent smell.

49. Jail medical staff failed to obtain a culture of the foot infection.

50. Jail medical staff failed to prescribe antibiotics for the foot infection.

51. No physician evaluated Mr. Nicholson's foot infection while he was incarcerated.

52. One evening, upon seeing Mr. Nicholson's foot, a night sergeant agreed that he needed medical attention and the nursing regional supervisor was called.

53. The nurse regional supervisor eventually came to Mr. Nicholson's cell and offered to "poke" around the wound to see what was going on. Mr. Nicholson declined and asked that he be brought to the hospital because his was in extreme pain due to the infection.

54. The Chief Deputy of the jail was present for this evaluation.

55. Following Mr. Nicholson's refusal to have the Regional Supervisor "poke" around the wound, Mr. Nicholson was brought to the Chief Deputy's office and told that because of his refusal, he would be transferred to TDOC.

56. Mr. Nicholson was transferred to multiple cells during his incarceration. He was

8

assigned to BOOK03-01 (July 26), A05-01 (July 28), BOOK02-FL01 (July 30), ISO02-FL01 (isolation housing) (August 6), D-51 (August 14), and BOOK02-01 (August 19). These frequent movements and isolated conditions impacted Mr. Nicholson's ability to access the appropriate medical services as his condition worsened.

### *Retaliation and Denial of Access to Grievance Process*

57. Per Policy Number 8.002, grievances are submitted electronically through kiosk machines. Mr. Nicholson was not given access to these kiosk machines.

58. Policy states that an inmate may ask for assistance from an officer or other inmate to write out a grievance to be input into the kiosk machine.

59. Instead of receiving assistance with the kiosk machines, Mr. Nicholson was given a pencil and paper to write his requests.

60. In late July 2025, approximately 2-3 days after injuring his toe, Mr. Nicholson submitted his first written request for medical attention regarding his deteriorating condition.

61. On August 10, 2025, Mr. Nicholson submitted a written request, asking to for help using his cellphone to unlock his debit card to put money on his phone account. Each of Mr. Nicholson's written requests was addressed to Lieutenant Kearstin Isbell.

62. Policy Number 8.002 states that if there is an emergency grievance "in which delay in handling could result in personal injury or other damages to the inmate" then that grievance "will be handled expeditiously."

63. On August 17, 2025, Mr. Nicholson submitted another written request. He wrote: "DUE TO DETECTIVE MARTINEZ INCORRECTLY DIS ASSEMBELING AND RE ASSEMBLING OF MY PROSTHETIC LEG ON APPX 20 JULY 2025 I NOW NEED AN APPOINTMENT AT THE SURGICAL CLINIC . PROSTHETIC DIVISION IN NASHVILLE

9

FOR CORREC REASSEMBLY AND ADJUSTMENT OF MY PROSTHETIC."

64. The jail staff responded to the August 17, 2025 request, stating "I will notify the nurse, but please put in a request to her as well."

65. Detective Martinez's improper handling of Mr. Nicholson's prosthetic device demonstrates deliberate indifference and negligence.

66. Detective Martinez's improper handling of Mr. Nicholson's prosthetic deprived Mr. Nicholson of his ability to move independently, yet Hickman County did not treat this matter as urgent and failed to escalate the matter appropriately.

67. The decision to not escalate the grievance appropriately was also a violation of Policy Number 8.002.

68. On August 19, 2026, Mr. Nicholson submitted another written request. He wrote: "AS IM SURE YOU ARE AWARE OF BY NOW I HAD ATTEMPTED TO NOTIFY THE NURSE OF MY CONDITION OF MY FOOT IN FRONT OF WITNESSES ONLY TO BE TOLD SHE DIDNT HAVE TIME TO FUCK WITH ME HER RESIDENT."

69. The nurse explicitly refused to provide medical care to Mr. Nicholson, even though she knew of his documented medical condition and worsening condition.

70. The jail administrator responded, "I was not aware of this until today, however I completely understand. We are taking this very seriously, and I will do what I can to help you." Through this response, the jail administrator implicitly acknowledged the nurse's misconduct.

71. Jail staff ignored all written requests and provided no meaningful medical response.

72. Mr. Nicholson also made verbal requests for medical attention to jail staff.

73. All of Mr. Nicholson's requests for medical attention were ignored.

74. Officer Stacy confiscated Mr. Nicholson's pen and paper from his cell which

10

prevented him from making further medical requests..

75.     Per Policy Number 11.001, inmates are permitted to retain writing materials in reasonable amounts.

76.     The confiscation of pen and paper prevented Mr. Nicholson from submitting further written requests or filing formal grievances and violated Policy Number 11.001.

77.     No one provided Mr. Nicholson with instructions on how to file grievances without pen and paper.

78.     No grievance forms were brought to Mr. Nicholson's cell.

79.     Mr. Nicholson was denied access to the administrative process to seek remedies for the unconstitutional conditions of his confinement.

### *Release and Medical Emergency*

80.     On August 19, 2025, at 7:20 P.M., Mr. Nicholson was released from Hickman County Jail by court order for Medical Furlough.

81.     In the Order, the Circuit Court for Hickman County found that "the defendant is having severe medical complications with his foot that could require amputation."

82.     The Circuit Court's order establishes the severity of the harm experienced by Mr. Nicholson and acts as a judicial recognition of a serious medical need that went inadequately addressed while he was in custody at the Hickman County Jail.

83.     Jail staff did not transport Mr. Nicholson to the hospital upon his release, rather Mr. Nicholson was forced to walk to the Emergency Room.

84.     On August 20, 2025, at approximately 2:15 p.m., Mr. Nicholson presented to Tristar Horizon Medical Center Emergency Department.

85.     Mr. Nicholson was diagnosed with a severe foot infection and uncontrolled

11

diabetes.

86. On August 21, 2025, Mr. Nicholson was admitted as an inpatient to Tristar Horizon Medical Center.

87. Between August 21, 2025, and August 28, 2025, Mr. Nicholson remained hospitalized for seven days due to osteomyelitis, an infection in his toe that had reached his bone.

88. During his hospitalization, Mr. Nicholson underwent surgical amputation of his second toe due to the severe infection.

89. The surgery was performed on August 26, 2025, and required general anesthesia and post-anesthesia care.

90. Mr. Nicholson's total hospital charges for this emergency hospitalization were $89,088.38.

### *Causal Connection and Harm*

91. Mr. Nicholson's foot infection developed as a direct result of Defendants' failure to provide adequate insulin and monitor his diabetes.

92. The amputation of Mr. Nicholson's second toe was a direct result of Defendants' failure to treat the foot infection while Mr. Nicholson was incarcerated.

93. Mr. Nicholson has suffered permanent disability from the amputation of his toe.

94. Mr. Nicholson has ongoing medical needs related to his diabetes and the amputation.

95. Mr. Nicholson has suffered and continues to suffer severe pain and suffering as a result of Defendants' deliberate indifference to his serious medical needs.

96. Mr. Nicholson has suffered and continues to suffer severe emotional distress as a result of Defendants' conduct.

12

**Monell Liability**

97.     Defendant Hickman County, through Sheriff Jason Craft and Jail Administrator Kearstin Isbell as final policymakers for the Hickman County Sheriff's Office and the Hickman County Jail, maintained official policies, customs, or practices that were the moving force behind the violations of Plaintiff's constitutional rights.

98.     These policies, customs, or practices included, but were not limited to:

a.  Tolerating, permitting, or encouraging constitutionally inadequate medical care for inmates with serious medical needs by contracting with Southern Health Partners, Inc. at a rate $140,867.88 annually ($11,738.99 per month) under Amendment No. 2, effective July 1, 2025, that was insufficient to staff, supply, or deliver adequate medical services to a chronically overcrowded inmate population;

b.  Failing to adopt, implement, or enforce an ADA compliance policy specific to the jail or any standalone policy governing wheelchair and mobility device retention for disabled inmates, despite Hickman County's documented history of ADA-related litigation; the Hickman County Sheriff's Office does not maintain a standalone ADA compliance policy specific to the jail, nor a standalone wheelchair and mobility device policy;

c.  Failing to adopt or maintain any written policy governing medical furloughs, leaving decisions entirely to ad hoc referrals to the District Attorney's Office with no procedural framework to protect inmates from prolonged incarceration despite serious medical deterioration; the Hickman County Sheriff's Office does not maintain a written policy or standalone procedures governing medical furloughs;

d.  Failing to maintain a written video surveillance retention policy, instead relying on

13

a manufacturer-configured overwrite system that automatically destroyed evidence approximately every 12 to 14 days, making it impossible to preserve footage of inmate treatment; because of this automatic overwrite function, any surveillance footage from the requested date range was overwritten in the ordinary course of business and has not been available since approximately September 2, 2025;

e.  Maintaining a kiosk-only grievance system with no written provision for accommodation of inmates unable to access the kiosk, and no alternative paper grievance process, thereby structurally foreclosing access to the administrative grievance process for those inmates; the Hickman County Jail utilizes a kiosk-based grievance and inmate request system, there are no separate blank paper grievance forms maintained or issued by the Hickman County Sheriff's Office for inmate use;

f.  Maintaining a persistent pattern or practice of operating the jail far in excess of its certified capacity of 110, thereby preventing adequate classification, supervision, and medical monitoring of inmates with known serious medical needs; and

g.  Failing to adequately train, supervise, and discipline medical and custodial staff regarding obligations to provide constitutionally adequate medical care to pretrial detainees with known serious medical conditions, including diabetic inmates with limb loss.

99.  Sheriff Jason Craft and Jail Administrator Kearstin Isbell, as final policymakers, either promulgated, ratified, or were deliberately indifferent to these unconstitutional policies, customs, or practices. The August 12, 2025 TCI inspection letter was sent directly to Sheriff Craft and copied to Kearstin Isbell, Jail Administrator, confirming that both final policymakers received contemporaneous notice of the facility's regulatory noncompliance during Plaintiff's period of

14

incarceration.

100. Hickman County had persistent, documented, and actual notice of systemic deficiencies in medical care, inmate oversight, and overcrowding at the jail spanning at least four years before Plaintiff's incarceration. Specifically:

a. The May 2021 TCI inspection found deficiencies in medical services including that MARS documentation did not meet minimum standards, and recommended against certification;

b. The April 2022 TCI inspection again found medical services deficiencies, including that inmate examinations were not consistently completed within standard and that sharps inventory did not meet standard, and recommended against certification;

c. The September 2023 TCI inspection found that documentation of the medication receipt system did not meet the standard, and that due to overcrowding in female housing units, the classification process did not meet the standard;

d. The August 2024 TCI inspection found the facility operating at 159 inmates against a certified capacity of 110, with an average daily population of 132, and found that due to overcrowding, the classification standard could not be met (the same finding made in 2023);

e. The August 12, 2025 TCI inspection, conducted during Plaintiff's incarceration, found 14 deficiencies, including that the medication receipt system did not meet standard, the medical inventory did not meet standard, inmate observation parameters did not meet standard, housing units required thorough cleaning, training records did not meet standard, and due to overcrowding, proper inmate classification could not be achieved; and

15

f. At the time of the August 12, 2025 inspection, the facility housed 169 inmates against a certified capacity of 110, with an average daily population of 152, 38 percent above certified capacity, conditions directly impairing the ability to adequately monitor, classify, and provide medical care to seriously ill inmates such as Plaintiff.

101. Hickman County also had direct judicial and litigation notice of prior constitutional failures in medical care at the Hickman County Jail. The *Estate of James Mathew Smithson* lawsuit alleged that Mr. Smithson was denied medical care while in the Hickman County Jail and died on April 30, 2022; that case was settled by the parties and dismissed by court order on October 6, 2023. The Smithson case directly parallels Plaintiff's claims and establishes that Hickman County had prior notice of the risk of serious harm or death arising from the same pattern of inadequate inmate medical care at the same facility.

102. Another prior ADA lawsuit, *James Darrell Beard v. Hickman County Govt.*, was resolved at trial in late February 2025, with a jury finding the County violated the ADA, specifically with respect to a diabetic amputee employee, and awarding backpay of $143,387, compensatory damages of $250,000, and reinstatement.

103. Additionally, *Stephen House v. William S. Davis et al.*, Case No. 1:25-cv-0029, filed May 2, 2025, alleges a violation of Title II of the ADA arising from conduct at the Hickman County Justice Center and was pending at the time of Plaintiff's incarceration.

104. The failure of Hickman County's policymakers to address these persistent and widespread practices, despite repeated TCI inspection findings, a prior inmate death, an ADA jury verdict, and at least two additional pending or recently-resolved civil rights actions constituted deliberate indifference to the constitutional and statutory rights of inmates in Hickman County's

16

custody, like Plaintiff, including Plaintiff's rights under the Fourteenth Amendment.

105. The unconstitutional conduct of jail staff, medical staff, and supervisors described in this Complaint was a direct and proximate result of Hickman County's policies, customs, and practices set forth above.

106. As a direct and proximate result of Defendant Hickman County's policies, customs, and practices, Plaintiff suffered the amputation of his second toe, a seven-day hospitalization, severe physical pain and suffering, permanent disability, uncontrolled diabetic crisis requiring emergency surgery, and ongoing medical complications.

107. As a result, Plaintiff is entitled to recover compensatory damages, medical expenses past and future, attorney's fees and costs pursuant to 42 U.S.C. § 1988, prejudgment interest, and any other legal or equitable relief to which he may be entitled.

108. Hickman County Jail utilizes a rewritable digital video recording system that operates on a continuous loop and automatically overwrites footage approximately every 12 to 14 days. Despite its knowledge of Nicholson's complaints and medical emergency, because no steps were taken to preserve footage, all surveillance recording from the period of Mr. Nicholson's incarceration was automatically destroyed by approximately September 2, 2025, two weeks after his release and shortly after any records request could be submitted. Hickman County maintains no written retention policy governing surveillance footage.

### Count I
### 42 U.S.C. § 1983 - Deliberate Indifference to Serious Medical Needs
### (All Defendants)

109. Plaintiff restates and incorporates herein the above paragraphs in their entirety.

110. As a pretrial detainee, Mr. Nicholson's right to adequate medical care is protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which prohibits deliberate indifference to a pretrial detainee's serious medical needs.

17

111. Plaintiff had a sufficiently serious medical need and a defendants acted with deliberate indifference, meaning they were actually aware of and consciously disregarded a substantial risk of serious harm to Plaintiff.

112. Plaintiff had objectively serious medical needs. Type 2 diabetes requiring three daily insulin injections is a well-established serious medical need whose denial poses substantial risk of diabetic crisis, ketoacidosis, organ failure, and limb loss. Plaintiff's developing foot infection, a condition of known heightened severity in diabetic patients, was additionally so obvious that any layperson would have recognized the need for immediate medical attention.

113. Defendants were aware of Plaintiff's serious medical needs. Plaintiff disclosed at intake on July 25, 2025, that he required three insulin injections per day for his diabetes. The intake questionnaire recorded that Mr. Nicholson had a history of diabetes; had a physical handicap; was on a special diabetic diet prescribed by a physician; was presently taking medications (Lisinopril, Pravastatin, Gabapentin, Adderall, and Levothyroxine); was under a doctor's care; and had blood pressure condition. Specifically, Mr. Davis wrote that Mr. Nicholson "HAS ONE LEG."

114. Plaintiff submitted at least three written requests for medical attention documenting his deteriorating condition. Plaintiff's foot infection was visibly observable to staff and inmates alike. The decision to release Plaintiff on an emergency medical furlough after only 25 days of incarceration is an admission by Defendants that they were aware of the severity of his condition.

115. Defendants deliberately disregarded Plaintiff's serious medical needs. Rather than providing three daily insulin injections, medical staff administered an average of only two injections every other day, which is a reduction of approximately 67% from his prescribed

18

regimen. Defendants failed to monitor Plaintiff's blood glucose levels daily, failed to order the correct amount or type of insulin, and failed to respond meaningfully to any of Plaintiff's written requests for medical attention.

116. Defendants deliberately disregarded Plaintiff's foot infection. Despite a visible, worsening infection in a diabetic patient, Defendants failed to obtain a wound culture, failed to prescribe antibiotics, and failed to arrange for a physician to evaluate the infection during Plaintiff's entire 25-day incarceration. The sole medical intervention was a nurse cleaning the wound once and instructing Plaintiff not to touch it.

117. The confiscation of Plaintiff's wheelchair on or about July 28, 2025, without any alternative mobility accommodation, directly prevented Plaintiff from independently accessing the medical unit to seek treatment, compounding Defendants' deliberate indifference to his medical needs.

118. Defendants' conduct was not the product of professional medical judgment, inadvertence, or good-faith error. The gross inadequacy of insulin administration, the complete failure to treat an infected diabetic wound despite repeated written and verbal requests, and the emergency medical furlough required by the severity of the resulting condition collectively demonstrate deliberate indifference, not medical discretion.

119. As a direct and proximate result of Defendants' deliberate indifference, Plaintiff suffered the amputation of his second toe, a seven-day hospitalization, severe physical pain and suffering, permanent disfigurement and disability, uncontrolled diabetic crisis requiring emergency intervention, and ongoing medical complications.

120. As a result, Plaintiff is entitled to recover compensatory and punitive damages against individual defendants, medical expenses past and future, pain and suffering, permanent

disability, attorney's fees and costs pursuant to 42 U.S.C. § 1988, prejudgment interest, and any other legal or equitable relief to which he may be entitled.

**Count II**
**42 U.S.C. 12131 et seq. - Violation of the Americans with Disabilities Act, Title II**
**(Hickman County Defendant)**

121. Plaintiff restates and incorporates herein the above paragraphs in their entirety.

122. Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

123. Plaintiff is a qualified individual with a disability within the meaning of the ADA. Plaintiff has Type 2 diabetes and a mobility impairment that substantially limits his major life activities.

124. Defendant Hickman County is a public entity subject to Title II of the ADA.

125. Defendants discriminated against Plaintiff on the basis of his disability by denying access to prescribed medications and failing to provide equal access to wound care.

126. Defendants' actions violated 42 U.S.C. § 12132 and applicable regulations, including 28 C.F.R. § 35.130.

127. As a direct and proximate result of Defendants' unlawful acts, Plaintiff suffered physical pain, emotional distress, humiliation, loss of mobility, and denial of access to necessary medical care.

128. As a result, Plaintiff is entitled to recover compensatory damages, injunctive relief, declaratory relief, attorney's fees, costs, interest, and any other legal and equitable relief to which he may be entitled.

20

**Count III**
**42 U.S.C. § 1983 - First Amendment Retaliation and Denial of Access to Courts and Grievance Process**
**(Against All Defendants)**

129. Plaintiff restates and incorporates herein the above paragraphs in their entirety.

130. The First Amendment protects a prisoner's right to file grievances and seek redress for violations of his constitutional rights.

131. Plaintiff engaged in protected activity by submitting three written requests for medical attention and attempting to file grievances regarding his unconstitutional conditions of confinement.

132. Defendants took adverse action against Plaintiff by confiscating his pen and paper on or about August 10, 2025, after he had submitted at least two written medical requests.

133. Defendants' confiscation of Plaintiff's pen and paper was motivated by Plaintiff's exercise of his First Amendment rights.

134. The confiscation of Plaintiff's pen and paper prevented Plaintiff from filing formal grievances and submitting further written complaints.

135. Defendants' actions had a chilling effect on Plaintiff's exercise of his First Amendment rights.

136. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff was denied access to the administrative grievance process and suffered emotional distress, humiliation, and frustration.

137. As a result, Plaintiff is entitled to recover compensatory and punitive damages, attorney's fees, costs, interest, and any other legal and equitable relief to which he may be entitled.

**Count IV**
**42 U.S.C. § 1983 - Municipal Liability**
**(Monell Claim Against Hickman County)**

21

138.    Plaintiff restates and incorporates herein the above paragraphs in their entirety.

139.    A municipality may be held liable under 42 U.S.C. § 1983 when a constitutional violation results from a municipal custom, policy, practice, or failure to train or supervise. *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978).

140.    The constitutional violations alleged herein resulted from customs, policies, and practices of Defendant Hickman County, including systematic understaffing of medical personnel, failure to provide adequate diabetes care protocols, and failure to train officers on ADA compliance and accommodation of disabled inmates.

141.    Defendant Hickman County's policymakers had actual or constructive knowledge of these deficiencies.

142.    Defendant Hickman County was deliberately indifferent to the consequences of its policies, customs, and practices.

143.    Defendant Hickman County's policies, customs, and practices were the moving force behind the constitutional violations suffered by Plaintiff.

144.    As a direct and proximate result of Defendant Hickman County's policies, customs, and practices, Plaintiff suffered the amputation of his second toe, severe physical pain and suffering, permanent disability, emotional distress, and ongoing medical complications.

145.    As a result, Plaintiff is entitled to recover compensatory damages, punitive damages, medical expenses, attorney's fees, costs, interest, and any other legal and equitable relief to which he may be entitled.

### RELIEF REQUESTED

Plaintiff respectfully requests:

1.      A jury trial;

2. Compensatory damages for physical injuries, severe pain and suffering, emotional distress, humiliation, permanent disability from amputation, and loss of enjoyment of life;

3. Punitive damages against individual defendants in their individual capacities;

4. Medical expenses, past and future, including hospitalization, surgery, and ongoing medical care;

5. Injunctive relief;

6. Declaratory relief declaring that Defendants violated Plaintiff's constitutional rights;

7. Attorneys' fees and costs under 42 U.S.C. § 1988;

8. Prejudgment interest and, if applicable, post-judgment interest; and

9. Such other and further legal or equitable relief to which he may be entitled.

Respectfully submitted,

/s/ Heather Moore Collins
Heather Moore Collins BPR # 026099
Lucia Izzolo BPR # 042496
HMC CIVIL RIGHTS LAW, PLLC
302 Peachtree Street
Nashville, TN 37210
615-724-1996
615-691-7019 FAX
heather@hmccivilrights.com
lucia@hmccivilrights.com
Attorneys for Plaintiff

23